**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) **Criminal No. 19-CR-369 (APM)** |
| | ) |
| | ) |
| **TERRELL ARMSTEAD,** | ) |
| | ) |
| | ) **Judge Amit P. Mehta** |
| **Defendant.** | ) |
| | ) |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this memorandum to aid the court in sentencing Defendant Terrell Armstead. The United States requests a sentence of 360 months incarceration, followed by a lifetime of supervised release. The Government is also seeking restitution in an amount of no less than $52,644 on behalf of O.S., the victim related to the count of conviction in this case. The Government's requests provide for a just sentence that balances the factors outlined in 18 U.S.C. § 3553(a).

I.    **Relevant Factual Background**

Beginning in May of 2018, the joint Metropolitan Police Department and Federal Bureau of Investigation's Child Exploitation Task Force conducted a proactive investigation using various applications on social media. *See* Presentence Investigation Report (PSR) ¶32. While searching for terms that are commonly associated with the commercial sexual exploitation of vulnerable victims, this task force discovered an Instagram account for "supreme_p16". *Id.* Instagram account "supreme_p16" contained pictures, videos, and comments indicating that the user of the

account was a sex trafficker exploiting young women.  *Id.*[1]  Instagram account "supreme_p16"

also contained pictures of females in hotels and displays of large amounts of U.S currency.  *Id.* at

¶33. Subsequent investigation revealed that the owner of the "supreme_p16" Instagram account

was Terrell Armstead, the Defendant.  *Id.* at ¶32.

Not only did the Defendant use his Instagram account to brag about his illegal "business"

that made money off of the sexual exploitation of women, but he also used the direct messaging

feature as a tool to recruit vulnerable, young women into his commercial sex enterprise.  On one

such occasion, in June 2018, the Defendant began to send messages to the Instagram account

"nikita.216"  *Id*. at ¶34.  The investigation revealed that the owner of this Instagram account was

O.S., the victim identified in Count 2, which is the count that the Defendant was convicted of

following a jury trial on March 16, 2020.  *Id.* at ¶34.  As this Court is now aware, in June of 2018,

O.S., who was living in Cleveland, Ohio, was struggling to survive in a toxic living situation.  At

that time, O.S. was being commercially sexually exploited by a man who was taking all of the

money O.S. was earning, and refusing to pay for basic necessities including food and clothing.

The Defendant took advantage of the desperate situation O.S. was trying to get out of.  He wrote

to O.S., "A new life is always one choice away…you got options Lil mama."  The Defendant

went on to explain to O.S.:

> *"I see a lot of potential in u..I know together we can accomplish anything and everything..I want to take u to the top before some lame game makes us regret being a member of this lifestyle..most dudes want to come up off u not with u and after being used and abused u might not wanna give me a chance to do it the Supreme way."*

---

[1] The term "p16" is known to law enforcement as a common way that individuals, like the Defendant, inform others that they consider themselves to be a "pimp." Other terms found within the posts in the supreme_p16 Instagram account include "#rpgo" (real pimping going on) and "#rhgo" (real hoeing going on).

Through the course of the conversation, the Defendant repeatedly attempted to induce, entice and persuade O.S. to travel from Ohio to the District of Columbia area in order to get her to engage in prostitution for his financial benefit. The Defendant promised O.S. that he knew "all the upscale sites" and that she could earn more money from wealthier clients. The Defendant assured O.S. that he knew how to make investments and that he would provide her with financial security for the rest of her life. The Defendant quite literally promised O.S. the world. In his efforts to get O.S. to leave Ohio, the Defendant assured O.S. that his "name is well known in this game," and that he would keep her safe and happy. The Defendant informed O.S. that "choosing" him meant that she would never have to face a problem or obstacle that life throws at her alone. After repeatedly encouraging her to pack her belongings and leave Ohio, on June 19, 2018, O.S. agreed to travel from Cleveland, Ohio to meet and work for the Defendant in the commercial sex trade. PSR at ¶35. On June 23, 2018, O.S. left Cleveland, Ohio and drove to the Defendant's home in Baltimore, Maryland. *Id.*

Four days later, on June 27, 2018, the Defendant posted a picture on his Instagram account of himself, O.S., and another woman, S.B. *Id.* at ¶36. In this post, the Defendant bragged, "I put pressure on my bitches ... if they don't fold ... they turn into diamonds." *Id.* As the months went by, the Defendant posted several other pictures and videos of S.B. and O.S. wearing provocative clothing and in various stages of undress. *Id.* The Defendant also enjoyed posting pictures of himself surrounded by firearms. *Id.* at ¶37. For example, on July 23, 2018, the Defendant posted a picture of himself holding a semi-automatic firearm while he was in Southeast D.C. There were several other pictures posted by the Defendant in which he, other males, O.S., and S.B. are holding firearms. *Id.* at ¶37. This is in spite of the fact that, as a convicted felon, the Defendant is

prohibited from possessing a firearm.

After arriving in Maryland, the Defendant would transport O.S. and S.B. to work in strip clubs in Washington, D.C., Baltimore, Maryland, and New York. The Defendant expected the young women to arrange commercial sex dates with customers inside these clubs.  Far from providing O.S. with financial security as promised, the Defendant required O.S. to give all of the money that she made from these dates to him.   The Defendant insisted that O.S. and S.B. make at least $1,000 per night.  *Id.* at ¶39.   The Defendant was extremely controlling, and insisted that O.S. and S.B. follow a laundry list of rules.   It was S.B.'s job to teach O.S. these rules, and to make sure that O.S. followed them.   *Id.* Some of these rules include the following:

- She should never walk ahead of the Defendant either on the track or whenever they walked as a group together in public, *i.e.* the shopping mall, the Defendant's mother's house;

- She should never look another man in the eye;

- She should never try to hold money back from the Defendant;

- She should not visit any friends or family alone;

- She should never talk to an African American male.

*Id.*

As the Government proved during trial, the Defendant used a variety of methods to exert control over his victims.   He pointed guns at both O.S. and S.B. and held a gun to O.S.'s head.  *Id.* at ¶40.   At trial, the Government introduced an extremely disturbing photograph that the Defendant took in which he is pointing a gun at S.B. while she is sitting up in bed.   The Defendant edited this picture and added the following text: "*What do you mean slow night?*"   Additionally, at trial, the jury heard testimony from both S.B. and O.S. that the Defendant sexually assaulted

S.B.  On one occasion, while the Defendant was having sex with S.B., he pointed a gun at her face.  *Id.* at ¶ 41.  The Defendant instructed S.B. to open her mouth.  Even after S.B. shook her head no and said no, the Defendant continued to demand that S.B. open her mouth while pointing a gun at her face.  When S.B. opened her mouth, the Defendant put the gun in S.B.'s mouth and called her a "good little bitch."

In addition to acts of physical violence, the Defendant exerted control over O.S. by taking her social security card, identification card, and her car keys.  *Id.* at ¶34.  He also prohibited her from going anywhere alone. *Id.* The Defendant's aggressive, assaultive and controlling behavior caused O.S. to live in fear that she would be physically harmed if she did not make her daily quota or if she tried to leave the Defendant.  *Id.*  It took O.S. months to figure out an exit plan in order to leave the Defendant.  She was finally able to leave in September of 2018.  O.S. was not permitted to take any of the money she earned, her phone, her laptop computer, or any of the clothing that the Defendant purchased for her using the money that O.S. and S.B. made through commercial sex.  While she packed her bags to leave, the Defendant paced around the house holding a loaded, semi-automatic weapon.  He continued to look out the windows, fearful that he was finally going to be arrested for his ongoing assaultive, exploitative, criminal conduct.  O.S. was able to leave the Defendant's home.  Shortly thereafter, the Defendant began serving a six-month sentence for his human trafficking conviction in Montgomery County, Maryland.  *Id.* at ¶¶ 46, 102.

Despite the fact that the Defendant pled guilty, and admitted to repeatedly transporting S.B. and another woman, identified during the Defendant's trial as E.G., to multiple hotels in Maryland for the purposes of commercial sex, the Defendant blamed the victims for the fact that he was held

accountable for his crimes.   In recorded jail calls that were admitted into evidence during the course of the trial, the Defendant can be heard telling S.B. that if she had "just kept her mouth shut" or "told them what I told you to" he would have never had to go to jail in the first place. While the Defendant was in jail, he called S.B. repeatedly – often several times a day.   He did so knowing that S.B. was on probation, and that a condition of her probation was that she not have any contact with the Defendant.   The Defendant didn't care about that.   This Defendant did not care about anything apart from the amount of money he was making by sexually assaulting and sexually exploiting vulnerable, young woman.

The jail calls speak for themselves.   The Defendant repeatedly berated S.B. for failing to make her daily quota.   *Id.* at ¶46.    In one phone call, the Defendant admonished S.B. for only making $6,000-$7,000 while he had been incarcerated.   *Id.*   When S.B. informed the Defendant that she "didn't care", the Defendant snapped, "What the fuck you mean you don't care? Who the fuck you talking to? Bitch stop playing before I smack the shit out of you."   *Id.*   Continuing his rant, the Defendant stated, "I've collected money from you for four years and it's never been that low after two and a half months."   Given the date that the Defendant made these statements, and S.B.'s age at the time, this is an admission on the Defendant's part that he began sexually exploiting S.B. when she was only sixteen years old.   *Id.*

The Defendant also used his calls to S.B. to check in on the status of his firearms.   *Id.* at ¶47.   As this Court is aware, in June of 2016, the Defendant pled guilty to Possession of a Controlled Substance and Possession of a Firearm by a Convicted Felon.   *Id.* at ¶100.   For these felony convictions, the Defendant received a five-year sentence, with four years and eight months suspended, to be followed by two years' supervised probation.   *Id.*   Having been convicted of a

crime punishable for a term of imprisonment exceeding one year, it was (and is) illegal for the Defendant to possess a firearm that had been shipped or transported in interstate commerce. *See* 18 U.S.C. § 922(g).   Nevertheless, in July of 2018, the Defendant purchased two .22LR caliber firearms, both with obliterated serial numbers.   *Id.* at ¶47.   On October 10, 2018, law enforcement officers executed a search warrant at the Defendant's residence in Baltimore, Maryland. While various types of ammunition, and a Sightmark Laser Sight for a firearm, were recovered, the firearms were no longer in the residence. *Id.*   During a recorded jail call, the Defendant and S.B. discussed how lucky they were that S.B. had removed the firearms from the Defendant's home, at the Defendant's request, before the warrant was executed.   *Id.*

The Defendant was arrested on January 18, 2019, for Conspiracy to Defraud the United States and Unlawful Possession of a Firearm.   *Id.* at ¶ 49.   He was held without bond in that case. Four months later, in May of 2019, the Defendant was arrested and charged with multiple counts, including Sex Trafficking of both O.S. and S.B. by Force, Fraud, or Coercion.   *Id.*   Over the next several months, the Defendant used his phone calls to S.B. in order to attempt to obstruct and interfere with the prosecution pending against him.   *Id.* at ¶50.   For example, when the Defendant learned that S.B. had been subpoenaed to appear before the grand jury, the Defendant instructed her on what to tell prosecutors, and how she should testify.   During a call on March 24, 2019, S.B. informed the Defendant that she was meeting with the prosecutor the following day. The Defendant instructed S.B., "Let them people know that I am not with no prostitution. I never took nobody nowhere for no prostitution or nothing like that. That I'm just your boyfriend."   *Id.* The Defendant's efforts succeeded, at first.   On March 25, 2019, S.B. came to the United States Attorney's Office and falsely claimed that while the Defendant drove her from Maryland to

locations in D.C., he did not know that she was going to engage in prostitution. *Id.* As a result, S.B. was arrested and charged with Conspiracy to Commit Sex Trafficking and Attempting to Obstruct, Interfere and Prevent the Enforcement of the Sex Trafficking by Force, Fraud and Coercion Statute. *Id.* at ¶51.

Even after S.B.'s arrest, the Defendant continued to use third parties – primarily his mother – to maintain consistent contact with S.B. Despite it being a clear violation of jail rules, the Defendant and his mother organized daily calls with S.B., so that the Defendant could continue to maintain control over S.B. in an effort to attempt to persuade her not to testify against him. As this Court is aware, on December 13, 2019, the Government asked for an Order from the Court, directing the Defendant to have no contact with S.B., in an effort to stop this ongoing conduct. When the jail discovered these violations, and restricted the Defendant's phone privileges, the Defendant began sending S.B. messages using the jail's commissary kiosk. These messages turned threatening and, in the weeks leading up to trial, the Defendant sent S.B. a message which read, "Stop fucking playing with me." *See* ECF 107 Tr. 115:12-17.

Even during trial, and despite the fact that the Government ensured that there was a separation order in place to prevent the Defendant from having any contact with S.B., the Defendant was yelling out to S.B. in the holding cells, even in the moments leading up to her testimony with the Court. Despite the presence of U.S. Marshals, the Defendant maintained his brazen, shameless, efforts to intimidate the most vulnerable victim in this case.

As stated above, the Defendant was convicted of one count of Sex Trafficking by Force, Fraud and Coercion, in violation of 18 U.S.C. Section 1591(a)(1), in March of 2020. Sentencing has been set for July 15, 2022.

II.    **A Sentence of 360 Months Accurately Reflects the § 3553(a) Factors**

In determining a reasonable sentence, the Court must consider the factors listed in 18

U.S.C. § 3553(a).[2]  These factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed –
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and
> (3) the kinds of sentences available;
> (4) the applicable sentencing guidelines range for the offense;
> (5) pertinent policy statements issued by the U.S. Sentencing Commission;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see also United States v. Pyles*, No. CR 14-00006 (RJL), 2020 WL 376787,

at *2 (D.D.C. Jan. 23, 2020); *United States v. Mitchell*, No. CR 05-00110 (EGS), 2019 WL

2647571, at *7 (D.D.C. June 27, 2019).   A district court, however, "need not consider every §

3553(a) factor in every case." *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008); *see also*

*United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017).

---

[2] "Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), the Guidelines serve only an advisory function. *Id.* at 245, 125 S. Ct. 738. Nevertheless, even in a post-*Booker* world in which the Guidelines are not binding, the sentencing court 'must calculate and consider the applicable Guidelines range" as its starting point. And *Booker* did not change "how the Guidelines range is to be calculated." *United States v. Mattea*, 895 F.3d 762, 766 (D.C. Cir. 2018) (internal citations and quotations omitted).

A.  Nature and Circumstances of the Offense

The Defendant engaged in a persistent course of conduct of meeting and recruiting vulnerable girls and young women for the purpose of sexually exploiting them for his own financial gain.   During trial, the Court heard testimony from both S.B. and O.S. about how the Defendant sexually exploited and violently assaulted them.   Additionally, the Court heard testimony that the Defendant also caused E.G., J.J., and M.C. (additional victims) to enter into the dangerous world of commercial sex work for his financial benefit.   His repeated actions in targeting extremely vulnerable young women were persistent, shameless, and ruthless.   The harm that each of these women has suffered at the hands of this Defendant is immeasurable.   Congress recognized the devastating harm that these criminal offenses cause to the victims and to the community, which is why it has authorized a 15-year mandatory minimum penalty, with a statutory maximum sentence of life imprisonment, following a conviction for this type of offense.

At trial, this Court heard testimony from both S.B. and M.C. about how this Defendant changed the course of his criminal career from selling and possessing narcotics, to selling minor victims and young women in order to line his pockets and support his lavish lifestyle.   S.B was only 16 years old at the time the Defendant began transporting her from Maryland, through the District of Columbia, and into Virginia, knowing that she would be engaging in commercial sex acts.   Both S.B. and M.C. testified that, beginning in early March 2015, the Defendant drove M.C. to S.B.'s house in Maryland.   He then drove both of the victims to a hotel.   Once they arrived at the hotel, the Defendant called Anthony Gray ("Gray"), who is the brother of Laura Gray, the

mother of the Defendant's children.[3]   Once Gray, AKA "Playboy," arrived at the hotel, he

informed the victims that they would be engaging in commercial sex acts with strangers.   Gray

had a professional looking camera and took pictures of M.C. in order to post advertisements online,

offering to sell M.C. for commercial sex.   While M.C. engaged in commercial sex acts in the hotel

room on that first occasion, S.B. did not.   The Defendant drove the victims home from the hotel

that first night.

This Court also heard testimony, and viewed records from the Red Roof Inn in Alexandria,

Virginia, about how the Defendant drove the victims and Gray from Lusby, Maryland to this Red

Roof Inn so that M.C. and S.B. could engage in commercial sex acts for his profit.   Once at the

Red Roof Inn, Gray took pictures of the victims with his camera, determined to use the pictures in

online advertisements that would offer S.B., a 16-year-old girl, and M.C., to individuals looking

for the opportunity to engage in commercial sex.   *Id.* at ¶22.   In these advertisements, the victims

are shown in various states of undress, and posed in a provocative manner.   Gray then used his

cellular phone to post these advertisements online.   One of the advertisements, posted on March

22, 2015, reads:

> *Gorgeous Mercedes Is Back And For A Limited Time – 23:*
> *Hey boy's it's Sophia & Mercedes, your number one duo. We*
> *are back to pick up where we left off. So stop wasting time with*
> *the one's that don't give you what your looking for and is a big*
> *wast of time. So pick up the phone and call us now and end your*
> *constant look for what you need!!! Mercedes (443) 404-6564.*

Gray and the Defendant were the ones who instructed the victims on what to say to potential

---

[3] Anthony Gray was charged separately.   *See* 1:12-cr-17.   He pled guilty to one count of Transportation of Minors in violation of 18 U.S.C. 2423(d).   He is scheduled to be sentenced on July 13, 2022.

clients who called in response to these advertisements. Gray taught the Defendant how much he should charge for each commercial sex act that S.B. and M.C. engaged in.   Both Gray and the Defendant made the conscious decision to not show S.B.'s face in these advertisements, due to her young age.   In fact, the Defendant instructed S.B. not to loiter outside the hotel room because he feared it would draw law enforcement attention and lead to his arrest.

This Court also heard testimony from M.C. and S.B. that while they were engaging in commercial sex acts inside the hotel room, Gray and the Defendant would be acting as lookouts in the hotel parking lot.   S.B. and M.C. were instructed by the Defendant to text him and inform him about when a "date" arrived, the amount of money that would be charged, and the time the date left.   The Defendant and Gray would then come to the hotel room to collect all of the money that M.C. and S.B. earned by having sex with strangers.   The testimony introduced at trial, and the Red Roof Inn records admitted as evidence, show that the Defendant brought S.B. and M.C. to this hotel so that they could engage in commercial sex dates for his financial benefit at least three or four times in March of 2015.   The trial testimony revealed that M.C. first began to split the money she earned with the Defendant, but that she later began to give Gray 100 percent of the money that she made.   S.B. gave all of the money that she made engaging in commercial sex work to the Defendant.

The ongoing course of criminal conduct that this Defendant engaged in is particularly egregious. He continued to violently assault and sexually exploit multiple vulnerable young women, and one minor, ***despite having been arrested twice before for engaging in these horrific offenses***.   Even (1) a felony conviction, (2) a jail sentence, and (3) being on supervised release did not deter him.   *See* PSR ¶102.

Consistent with the testimony this Court heard during trial, research shows that the sex trafficking of women and girls is a violent offense that poses a grave danger to the safety of the community.   The world of commercial sexual exploitation is extremely dangerous.   Studies have shown that women who are engaged in prostitution experience violence ranging from slapping and punching to assaults with deadly weapons and rape.   *See* Dalla, R. (2000, November). *Exposing the "pretty woman" myth: A qualitative examination of the lives of female streetwalking prostitutes*. The Journal of Sex Research, 37(4), 344-353 (In a study of prostituted women, 72.1 % reported severe abuse at the hands of pimps, male sexual buyers, or boyfriends.   The acts of abuse include being raped, beaten with objects, threatened with weapons, or abandoned in remote locations).   Indeed, this Court heard extensive testimony from S.B. and O.S. regarding how the Defendant physically assaulted them, pointed guns at their heads, and sexually assaulted S.B. by placing a gun in her mouth during a sexual encounter.   Furthermore, an investigation into the mortality rate of women in prostitution revealed that the leading cause of death was homicide, and found that actively prostituting women were nearly 18 times more likely to be murdered than women of similar age and race.   *See* Potterat, J., Brewer, D., Muth, S., Rothenberg, R., Woodhouse, D., Muth, J. et al. (2004). *Mortality in a long-term open cohort of prostitute women*. American Journal of Epidemiology*, 159(8), 778-785. Given these statistics, both O.S. and S.B. should consider themselves lucky to be alive after what this Defendant put them through.

Studies have also demonstrated that a high percentage of individuals who are involved in commercial sex work want to stop prostituting, but feel that they are trapped.   *See* Farley, M. and Barkan, H. (1998). *Prostitution, violence against women, and posttraumatic stress disorder*. Women & Health, 27(3), 37-49.   As detailed below, one of the Defendant's victims, J.J.,

expressed this exact sentiment when she encountered law enforcement in June of 2015, after the Defendant dropped her off at an apartment building for a "date."

It must be highlighted that this is a Defendant who chose to recruit, manipulate, and deceive a sixteen-year-old girl by pretending to be her boyfriend, all the while he was offering her up to be sexually abused by adult men for his financial gain. The sexual abuse of a minor often leads to lasting and devastating consequences for the victim. Studies suggest that early trauma, including sexual abuse, may interfere with brain development, and can produce various neuropsychiatric symptoms commonly associated with drug use. *See* Anderson, C. M., Teicher, M. H., Polcari, A., & Renshaw, P. F. (2002): Abnormal T2 relaxation time in the cerebellar vermis of adults sexually abused in childhood: Potential role of the vermis in stress-enhanced risk for drug abuse. *Psychoneuroendocrinology, 27*, 231-244; Baynard, V. L., Williams, L. M., & Siegel, J. A. (2001): The long-term mental health consequences of child sexual abuse: An exploratory study of the impact of multiple traumas in a sample of women. *Journal of Traumatic Stress, 14*(4), 697-715 (noting that child sexual abuse victims reported a lifetime history of more exposure to various traumas and higher levels of mental health symptoms). Other studies have found that individuals who suffer sexual abuse in their childhood years have a higher rate of anxiety, disruptive behaviors, substance abuse, and personality disorders compared to others who may have experienced other forms of abuse or neglect. *See* Cohen, P., Brown, J., & Smailes, E. (2001): Child abuse and neglect and the development of mental disorders in the general population. *Development and Psychopathology, 13*, 981-999; Dube, S. R., Anda, R. F., Felitti, V. J., Chapman, D. P., Williamson, D. F., & Giles, W.H.(2001): Childhood abuse, household dysfunction, and the risk of attempted suicide throughout the life span: Findings from

the adverse childhood experiences study.  *JAMA, 286*(24), 3089-3096 (noting that a powerful relationship exists between adverse childhood experiences and risk of attempted suicide through the life span); Merrill, L. L., Thomsen, C. J., Sinclair, B. B., Gold, S. R., & Milner, J. S.   (2001): Predicting the impact of child sexual abuse on women: The role of abuse severity, parental support, and coping strategies.  *Journal of Consulting and Clinical Psychology, 69*(6), 992-1006 (child sexual abuse is a significant predictor of long-term psychological difficulties ranging from depression and anxiety to sexual problems and dissociative symptomatology).   Research also indicates that sexually abused adolescents are at an increased arrest rate for sex crimes and prostitution, and are at an increased risk for earlier pregnancy.  *See* Putnam, F. W.   (2003):   Ten-year research update review: Child sexual abuse.  *Journal of the American Academy of Child and Adolescent Psychiatry, 42*(3).   Indeed, this Court heard the testimony of S.B., and several other women, about the devastating impact that the Defendant's criminal acts had on their lives.   S.B. has not only been the victim of physical abuse at the hands of the Defendant, but she has suffered from drug and alcohol addiction and depression. The victims have also suffered legal consequences, which could follow them for the rest of their lives.   S.B., J.J., and E.G. were all arrested due to being "in the life" that this Defendant introduced them to.   For all of the reasons discussed above, a guidelines sentence of 360 months of incarceration, followed by lifetime supervised release, will reflect the gravity of the Defendant's conduct and the long-term harm that he has caused to numerous vulnerable victims.

B.   History and Characteristics of the Defendant

The Defendant has an extensive criminal history.   In January of 2011, he was convicted of Conspiracy to Commit Armed Robbery, as well as a firearm offense, after being seen fleeing

the scene. *See* PSR at ¶94. He was sentenced to fifteen years imprisonment, with all but two years suspended. *Id.* As this Court is well-aware, the Defendant was arrested twice within a very short time period in June of 2015. On June 2, 2015, officers with the Manassas City Police responded to a complaint of prostitution at a Super 8 Motel. *Id.* at ¶100. When officers entered the Defendant's room, they found marijuana in the nightstand and cocaine and a handgun in the reservoir of the toilet. *Id.* Later that same month, on June 16, 2015, the Defendant was arrested and charged with Use of a Car to Aid Prostitution. *Id.* at ¶101. During trial, this Court heard testimony from J.J. and the Arresting Officer regarding what happened on that date. On June 16, 2015, after viewing a commercial sex advertisement, law enforcement, acting in an undercover capacity, agreed to meet J.J. at an apartment building in Arlington, VA. *Id.* at ¶101. Law enforcement observed the Defendant and his associate, Jamal Walker Davis, drop J.J. off at a residential building so that she could engage in a commercial sex date. *Id.* When J.J. first encountered law enforcement at the apartment building, she told them that she was being forced to engage in commercial sex for the Defendant's profit. *Id.* She explained how the Defendant had transported her from Maryland to the Northern Virginia area, and that he had taken her to numerous hotels in the area, along with other girls, in order to engage in commercial sex for his profit. *Id.* Indeed, this Court viewed advertisements that the Defendant posted on Backpage which featured J.J. posing along with S.B. J.J. told law enforcement that she wanted to stop engaging in commercial sex work, and return home, but the Defendant would not let her. *Id.* Over time, J.J. became uncooperative with law enforcement, which is sadly not uncommon in these types of cases. *Id.* As a result, the Defendant pled guilty to Disorderly Conduct, and his 90-day jail sentence was suspended. *Id.*

In September of 2018, the Defendant pled guilty in Montgomery County, Maryland to Human Trafficking. *Id.* at ¶102. This conviction resulted from a multi-month investigation, in which law enforcement observed the Defendant transport S.B. and E.G. to various hotels in Maryland, so that they could engage in commercial sex work for his financial gain. During trial, the Court heard testimony from both S.B. and E.G. regarding the underlying facts of the Defendant's conviction. Additionally, this Court observed numerous online advertisements that the Defendant posted, offering up both S.B. and E.G. for commercial sex, as well as pictures documenting law enforcement's surveillance of the Defendant, S.B., and E.G. The Defendant received a sentence of 5 years imprisonment, with all but 4 years and 6 months suspended. *Id.* at ¶102. He was placed on three-years supervised probation upon his release from prison. *Id.* His special conditions of supervision prohibited him from possessing a firearm or renting hotel rooms for the purposes of prostitution. *Id.* The Defendant brazenly thumbed his nose at both of these special conditions. As soon as he was released, he went right back to sexually exploiting S.B., and to posting pictures of himself surrounded by firearms. In fact, as this Court is well-aware, the Defendant was arrested and subsequently pled guilty, in September of 2019, to Conspiracy to Commit an Offense Against the United States and Possession of a Firearm by a Person Previously Convicted of a Felony. He is facing up to 10-years imprisonment as a result of that conviction. *See* 18-cr-00357. Additionally, he was arrested on May 2, 2019 and subsequently convicted on March 16, 2020 for Sex Trafficking by Force, Fraud and Coercion, in violation of 18 U.S.C. § 1591. It is clear that rather than learning from his prior arrests, and the numerous times he was sentenced to spend time in jail, the Defendant continued with the same criminal conduct involving the exploitation of vulnerable girls and young women. The fact that he was on Probation when

he committed the offenses that bring him before the Court for Sentencing in this matter shows that this Defendant is unwilling to follow any conditions of release that this Court may impose following the termination of his prison sentence.

Everything detailed above shows that this is a Defendant who has engaged in this violent, exploitative, criminal conduct for over a decade, and he has done so with impunity. To this day, the Defendant has shown no remorse for the criminal course of conduct he engaged in, nor the damage that he has caused to numerous lives.   For all of these reasons, a sentence of 360 months, followed by lifetime supervised release, is necessary.

C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense

This factor is known as the "just deserts" concept, answering the need for retribution so that the punishment fits the crime and the defendant is punished justly.   *See United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010).   The *Irey* court cited the Senate Report regarding this provision:

> This purpose--essentially the "just desserts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct.   From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.

*Id.* (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

As detailed above, the sexual abuse and exploitation of women and young girls are offenses that have lifelong, devastating consequences for the victims. When this Defendant introduced several young women and a 16-year-old girl to the world of commercial sex, he subjected each one of them to physical and sexual violence, both at his hands and at the hands of the "johns;" sexually

transmitted diseases; substance abuse and mental health issues; and criminal consequences. With respect to 18 U.S.C. § 3553(a)(2)(A), a Guidelines sentence of 360 months would provide "just punishment" for the Defendant's offenses, promote respect for federal sex trafficking laws, and reflect the seriousness of his offenses and offenses against minor victims in general.

    D.  <u>The Need for the Sentence Imposed to Afford Adequate Deterrence</u>

"Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor." *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007). Congress, the Supreme Court, and the Sentencing Commission have demonstrated that general deterrence is a very important factor when considering an appropriate sentence. *See United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017) (the sentence would deter Fry and "others who may be inclined in doing similar kinds of things."); *see also United States v. Ferber*, 458 U.S. 747, 760 (1982). A sentence of 360 months in this case is a lengthy, but just, sentence that would support Congress's aim of generally deterring the sexual abuse and exploitation of other vulnerable victims. Such a sentence demonstrates that federal courts take physical assaults, sexual abuse, and commercial sexual exploitation seriously, and that offenders will be held to account for the long-term damage that they cause to their victims.

    E.  <u>The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant</u>

A significant sentence is necessary to protect the public, including other vulnerable victims from future crimes committed by this Defendant. As a general matter, sex offenders have a high rate of recidivism. *See Lombard v. United States*, 44 F. Supp. 3d 14, 26 (D.D.C. 2014) (noting that the lower court's concerns about recidivism was supported by substantial authority (citing *Smith v. Doe,* 538 U.S. 84, 103, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) ("The risk of recidivism

posed by sex offenders is frightening and high.") (citations omitted); *McKune v. Lile,* 536 U.S. 24, 33, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (noting that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested"); *United States v. Allison,* 447 F.3d 402, 405–06 (5th Cir.2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders."). Indeed, given the Defendant's prior convictions for both firearm related offenses as well as Human Trafficking offenses, he stands before the Court as a recidivist.

There can be no doubt that this Defendant poses a grave danger not only to the victims in this case, but to the community as a whole. The victims and testifying witnesses in this case are still so fearful of this Defendant that they feel unable to attend Sentencing in this matter. In addition to actively seeking out, targeting, and recruiting extremely vulnerable victims in this case, the Defendant possessed numerous dangerous firearms at his home, and he used them to threaten, abuse, and sexually assault the victims in this case. Even after his arrest, and even while behind bars, the Defendant actively attempted to obstruct justice, derail the investigation, and intimidate witnesses testifying against him. He did so in countless jail calls that the Government introduced into evidence at trial. As mentioned before, he continued this quest to silence his victims up until moments before S.B. took the stand to testify against him.

Furthermore, the Defendant's criminal history is lengthy, and contains violent offenses such as Conspiracy to Commit Armed Robbery, Weapons Possession, and Human Trafficking. As such, a sentence of 360 months is necessary to protect the public from future crimes committed by the Defendant.

### III.    Restitution

In this case, restitution is mandatory by law.   For any offense under Chapter 77 of Title 18, which includes sex trafficking in violation of § 1591, Congress has provided that the Court "*shall* order restitution." 18 U.S.C. § 1593(a) (emphasis added).   Here, Armstead was convicted of the offense of Sex Trafficking by Force, Fraud and Coercion, in violation of 18 U.S.C. Section 1591(a)(1), thus triggering the mandatory restitution requirement.

The statute provides that this mandatory restitution order "shall direct the defendant to pay the victim...the full amount of the victim's losses." *Id*. at (b)(1).   Further, "[t]he statutory language is clear that mandatory restitution includes not only the victims' actual losses, but also the defendant's ill-gotten gains." *United States v. Webster*, No. 08-30311, 2011 WL 8478276, at *3 (9th Cir. Nov. 28, 2011) (citing 18 U.S.C. § 1593(b)(3)).

The statute defines losses as the sum of two distinct types of compensation – personal losses and the economic value of the victim's services. *See id*. at (b)(3). The former is given the same meaning as the phrase "the full amount of the victim's losses" as defined in 18 U.S.C. § 2259(b)(3). 18 U.S.C. § 1593(b)(3).   Such losses include any "losses suffered by the victim as a proximate result of the offense." 18 U.S.C. § 2259(b)(3)(F).   The latter category of victim loss – the economic value of the victim's services – is defined as "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act (29 U.S.C. 201 et seq.)." 18 U.S.C. § 1593(b)(3).

In calculating "the gross income or value to the defendant of the victim's services or labor," courts have used various methods, including relying on victims' accounts of the work they

performed and prices charged for such work, as well as evidence gathered during the government's investigation regarding the work performed.  In a sex trafficking case, the value of a victim's services to a defendant is generally calculated based on a defendant's gross income from commercial sex acts performed by the victim.  For example, in *United States v. Lewis*, 791 F. Supp. 2d 81 (D.D.C. 2011), the court based its restitution figures on the length of time the victims performed sex work for the defendant, the average number of clients the defendant compelled the victims to service each night, and the average price charged per client. *Id*. at 92-94.   The restitution figures were not exact accountings of the work performed and prices charged, but instead the court's best estimate based on the available evidence. *Id*.

Similarly, in *United States v. Webster*, 2011 WL 8478276 (9th Cir. Nov. 28, 2011), the Ninth Circuit affirmed a restitution calculation in a sex trafficking case where the district court used the following calculation: "the number of weeks trafficked times the average number of days worked per week times the average number of dates per day times $150—the minimum amount the victims charged for a date[.]" *Id*. at *3.   The Circuit Court held that "[t]he district court need only estimate, based on facts in the record, the victims' losses with some reasonable certainty." *Id.* (internal citations and quotations omitted).   The court also noted that "[a]ny error in the district court's figure [was] more than offset by the conservative estimate of the fee per date used to determine restitution," given that some victims had testified that they regularly charged more than $150 per date. *Id*.

Restitution equivalent to the victims' earnings is appropriate notwithstanding the fact that the defendant's unjust enrichment was derived from illegal activity – in this case, prostitution. In *United States v. Mammedov*, 304 F. App'x 922 (2d Cir. 2008), the Second Circuit stated, "the

express terms of 18 U.S.C. § 1593 require that the victims in this case, *i.e.*, persons who engaged in commercial sex acts within the meaning of 18 U.S.C. § 1591, receive restitution, notwithstanding that their earnings came from illegal conduct." *Id*. at 927.   And in *United States v. Fu Sheng Kuo*, 620 F.3d 1158 (9th Cir. 2010), the Ninth Circuit explained that "the Trafficking Act mandates restitution that includes a defendant's ill-gotten gains." *Id*. at 1164.   Finally, in *United States v. Cortes-Castro*, 511 F. App'x 942 (11th Cir. 2013), the court declared "preposterous" a defendant's argument that such a restitution award would unfairly reward the victim for her illegal activity, given that the victim was "forced to prostitute." *Id*. at 947; *see also United States v. Williams*, 319 F. Supp. 3d 812, 816 (E.D. Va. 2018) (finding that "it is appropriate, and indeed necessary, to consider the gross income or value of the minor victims' prostitution activities in calculating the amount of restitution owed by defendants here").

The Government bears the burden of proving the proper amount of restitution by a preponderance of the evidence. 18 U.S.C. § 3664(e).   However, "courts have made clear that the amount of restitution need not 'be proven with exactitude.'" *Williams*, 319 F. Supp. 3d at 816 (quoting *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012)).   Rather, all that is required to support a restitution order is "some reasonable certainty." *United States v. Monzel*, 641 F.3d 528, 540 (D.C. Cir. 2011) (quoting *United States v. Doe*, 488 F.3d 1154, 1160 (9th Cir. 2007)).   In this regard, courts calculating restitution amounts are entitled to rely on any evidence "bearing sufficient indicia of reliability to support its probable accuracy." *United States v. Baston*, 818 F.3d 651, 665 (11th Cir. 2016).   And importantly, evidence can be sufficiently reliable for restitution purposes even where it is not subject to cross-examination.  *See United States v. Hairston*, 888 F.2d 1349, 1353 n.7 (11th Cir. 1989) (relying on hearsay evidence to calculate restitution); *In re*

*Sealed Case*, 702 F.3d at 67 (relying on grand jury testimony to calculate restitution).

In this case, O.S. testified at trial that she drove from Ohio to Maryland in June 2018 to work for the Defendant in his commercial sex business.   She also testified that she worked for the Defendant in his commercial sex business until approximately September 2018.   During this period of time, O.S. testified that she worked "every day of the week, 7 days" but did get one week off.   Therefore, in total, O.S. engaged in commercial sex at the defendant's direction and gave him the monetary proceeds of her commercial sex activities for approximately 88 days.   O.S. also testified that she charged a minimum of $500 per date and that the Defendant had a minimum of $500 a day that she was required to earn.   Based on the most conservative estimate using these figures (88 days, $500/day), the Defendant's unjust enrichment at O.S.'s expense is $44,000.   In addition, O.S. has calculated the following additional costs incurred as a direct result of the Defendant's sex trafficking by force, fraud, and coercion: (1) $1,200 for a new phone, which she had to purchase because the Defendant confiscated her phone; (2) $800 for a laptop computer, which she had to purchase because the Defendant confiscated her laptop; (3) $3,000 for clothing, which she was required to purchase to work for the Defendant's commercial sex enterprise; (4) $3,012 for therapy costs, which she incurred due to the Defendant's illegal actions toward her; and (5) $632 for her roundtrip travel from Ohio to Maryland.

The Government accordingly moves the Court to order the defendant to pay restitution to O.S. in the amount of $52,644 at a minimum.

## IV.    Forfeiture

The Government may provide to the Court a motion and proposed order of forfeiture.   The Government asks the Court to sign an Order of Forfeiture that will require the defendant to forfeit

all property that was intended to be used or was used in the commission of the offenses.

### V.      Requirement to Register as a Sex Offender

This conviction the Defendant has sustained in this case gives rise to the requirement that he register as a sex offender.   *See* 42 U.S.C. §§ 16911, 16913, 16915.   The Government asks the Court to instruct the Defendant of his obligations in this regard.

### VI.      Conclusion

The Government submits that a Guidelines sentence of 360 months, followed by a term of lifetime supervised release, is a reasonable sentence in this case and is "sufficient, but not greater than necessary to comply with the purposes" of sentencing.   18 U.S.C. § 3553(a).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

_____/s/_____

Amy E. Larson
Elizabeth Hutson
Assistant United States Attorney/Trial Attorney

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on July 6, 2022, I caused the foregoing to be filed with the court using the CM/ECF system that will send notification of such filing to all registered users.

*/s/*_____
Amy Larson